SUPERIOR TESTERS, INC., Plaintiff,

v.

DAMCO TESTERS, INC., et al., Defendants.

Civ. A. No. 69–726.

United States District Court, E. D. Louisiana, New Orleans Division.

June 29, 1971.

A. J. Gray, III, New Orleans, La., Harvey B. Jacobson, Jr., Washington, D. C., H. Minor Pipes, Houma, La., for plaintiff.

Gerald F. Lofaso, Houma, La., Carlos A. Torres, Houston, Tex., Nathan Greenberg, Gretna, La., for defendants other than Brown Oil Tools, Inc.

Philip J. McMahon, Houma, La., Charles A. Keilin, Houston, Tex., for defendant Brown Oil Tools, Inc.

RUBIN, District Judge:

"An injured friend is the bitterest of foes."[1] The bitter foes in this patent infringement action, Lee Matherne and Darwin A. Miller, were two of the three original directors of Superior Testers, Inc. Superior's third director was Matherne's wife. Superior had obtained an exclusive license to use certain pipe-testing equipment from Brown Oil Tools, Inc., which held patents on the equipment. After a disagreement between Matherne and Miller over Miller's management of Superior, Matherne took over active management of Superior and Miller organized a new competing business, Damco Testers, Inc. Damco, by an agreement dated February 25, 1969, purchased the Brown patents. Superior brought this action when Damco allegedly began making and using equipment infringing Superior's exclusive license.

In its original petition, Superior asked that Damco be enjoined "from making, using or selling" the equipment covered by the Brown patent. On December 18, 1969, this Court issued an order restraining "Damco Testers, Inc. (Damco) and all agents or employees and all persons in active concert and participation with Damco . . . from using the patented equipment that is the subject matter of this suit in Louisiana and offshore from the Louisiana coast."

On February 18, 1971, after a hearing, this Court issued an order finding Damco "in willful and deliberate contempt and violation" of the December 18, 1969, restraining order "by the continued use since that date of the patented equipment that is the subject matter of this suit within plaintiff's exclusive territory," and also finding Miller in contempt resulting from "the acts of persons for whose conduct the Court considers him to be responsible," though not with his "personal and actual knowledge." That order also granted Superior reasonable attorneys' fees and costs in connection with the preparation and prosecution of its motion for contempt.

1. Thomas Jefferson, French Treaties Opinion, 1793.

This opinion will set out the findings of fact upon which that finding of contempt was based, and will determine the sums to which Superior is entitled as attorneys' fees and costs.

## FINDINGS OF FACT ON SUPERIOR'S MOTION FOR CONTEMPT

In internally testing pipe in oil well operations, a "top tool" and a "bottom tool" are used to seal off a segment of pipe, and that segment is subjected to controlled hydraulic pressure. The licensing agreement, and the patent on which it is based, contemplate the use of both the Brown "top" and "bottom" tools in conjunction with each other. If Damco used only a Brown "top tool," this would not violate the restraining order for it would not violate the license.

But a Brown top tool is readily convertible to a bottom tool, and it was acknowledged by Damco that a converted Brown top tool would be no more than a colorable variation of the Brown bottom tool; if Damco used a converted Brown top tool as a bottom tool in its testing operations, Damco would be in violation of the Court's injunction. The one obvious difference between the Brown top tool converted to use as a bottom tool and a different bottom tool designed by Damco is that the Damco bottom tool is set externally by "swab cups." Additionally, the Damco tool could not be used to test the Otis nipples of 5.95 weight 2⅜″ pipe because such nipples have an inner diameter or "drift" of less than 1.770″, the smallest outer diameter of any Damco bottom tool produced at the hearing. The Brown tool could, if converted to a bottom tool, pass through and test Otis nipples for 5.95 weight 2⅜″ pipe, however, because Damco had Brown tools with an outer diameter as small as 1.5″.

■ The evidence heard at the contempt hearing established at least three and perhaps five occasions after the issuance of the injunction when the Brown tool was used in violation of the Court's prohibition.

*Rowan Rig 13—December 24, 1969*

A former Damco employee, Bill Strickland, testified at the hearing that he had, while working on Rowan 13 on December 24, 1969, converted a Brown top tool to a bottom tool. This testimony was in direct contradiction of his testimony on deposition, but the in-court testimony was corroborated by at least four of Superior's witnesses. Liley Porche, Jr., a Superior casing crews employee who happened to be working on loan as a tong operator on Rowan 13 on December 24, and Minos J. Landry, a Rowan driller, both testified, and I believe truthfully, that testing operations on that day were begun with a bottom tool with swab cups, but that, when the operation became difficult, the crewmen switched to a bottom tool without swab cups. Fred LaRose, another believable witness, also testified that, when he arrived on Rowan 13 pursuant to his instructions from Lee Matherne, his employer, he found the Brown tool in use. Porche and Landry also testified that when Matherne arrived at the rig after being informed by LaRose that the Brown tool was being used, the tool without swab cups was removed before Matherne arrived on the drilling floor, so that they would not get "caught," according to Porche, and the rig was shut down for more than an hour while Matherne was on board. Leo Dupree, a Rowan tool pusher, testified that the operators said they could not test with Matherne around. When operations were resumed with a bottom tool with swab cups, the difficulties encountered were such that the rig was shut down early for Christmas holidays.

*Lyons #1—July 15, 1970 (Damco Invoice 434) and Texaco 8184—November 2, 1970 (Damco Invoice 608)*

Damco's invoices established that on both of these jobs 5.95 weight 2⅜″ pipe was tested. In addition, on the Texaco job, some 7.7 weight 2⅜″ pipe with an inner diameter of 1.609″ was tested. Wilbur Kibodeaux, a Damco operator whose name appeared on both job tickets

and who was summoned to Court directly from his work on an oil rig in the Gulf of Mexico to insure that his testimony would not be prepared in advance, testified, again contrary to his prior deposition, that on both jobs a converted Brown top tool was used as a bottom tool. Kibodeaux stated that the only alternatives were to use the converted Brown tool or to shut down the operation.

*Rowan Rig 11—September, 1970*

Leo Dupree and Herbert Quick, who were working on the rig for Damco, both testified that testing operations were accomplished with a bottom tool without swab cups. Quick testified that the bottom tool was a Brown top tool which Bobby Danford, the Damco operator, converted.

*SCI Rig—January, 1970*

Lee Matherne and Fred LaRose testified that Damco was testing with Brown tools.

Douglas Floyd, who was a Damco employee on Rowan 13, and Bobby Danford, Damco's operator on Rowan 11, were called by Damco, and both testified that they never used any bottom tool other than Damco's. I am unable, however, to give credit to the testimony of either of these witnesses. These were the only Damco employees to testify concerning the occasions when I find that the Brown tool was used.

In his testimony, Wilbur Kibodeaux stated that whenever it became necessary in the course of operations, Damco operators could request a Brown top tool from the Damco office, and convert it at the site with a piece of equipment carried in the operator's tool box.

The above facts convinced me that several Damco employees were making and using Brown bottom tools in the course of their testing operations, and therefore I found that Damco was in willful and deliberate contempt of the Court's December 18, 1969, restraining order.

■ With respect to Darwin A. Miller, the proof adduced at the hearing did not satisfy me that he was actually aware of the use by his employees of the converted Brown top tool. Miller, however, is president, principal stockholder, chief executive, and guiding force in the organization and management of Damco. Like any other corporation, Damco has no existence apart from its employees. The knowledge of Damco employees acting in violation of this court's orders is imputed to Miller. Furthermore, even if Miller was not actually aware of the use of the Brown tool by his employees, he should have been. It was not enough that he ordered his employees on December 19 or 20, 1969, not to use the Brown bottom tool. It was incumbent on him as Damco's manager to take steps to insure compliance with his orders and those of this court.

The evidence was clear and convincing that Damco had acted in willful and deliberate contempt, and D. A. Miller, in constructive contempt, of this Court's order. The order finding contempt directs certain procedures designed to avoid any future actions in contempt of this Court's authority.

## ATTORNEYS' FEES AND COSTS

■ In a civil contempt proceeding, the court has discretion to award reasonable attorneys' fees and other expenses "necessary to make an innocent party whole." Dow Chemical Co. v. Chemical Cleaning, Inc., 5 Cir. 1970, 434 F.2d 1212, 1215, and cases cited therein.

■ Superior has filed an itemized statement of attorneys' fees and costs incurred with regard to the contempt motion. Based on those data, I have determined that a reasonable award should include reimbursement for the sums paid for the services of the law firms of O'Brien & Jacobson and Milling, Saal, Benson, Woodward & Hillyer. The fee and costs incurred for the services of the firm of Pipes & Pipes is not included because that firm is paid a monthly retainer, and the plaintiff seems to have

incurred no additional expense because of the contempt motion. It is suggested that Pipes & Pipes are normally retained by Superior Casing Crews, not Superior Testers, but the evidence indicates that Mr. Matherne is the dominant shareholder in both firms, and it does not sufficiently indicate their independence for me to distinguish them.

Similarly, the claim for reimbursement of a percentage of the salary of Lee Matherne is rejected because that expense was a continuing expense of the company, and did not represent any additional cost resulting from the violation of the court's orders.

Mr. Harvey B. Jacobson, Jr., of O'Brien & Jacobson, bills for his services at the rate of $40.00 per hour and $300.00 per day. This rate is reasonable and in accordance with the scale of charges customary in New Orleans. He is an experienced and able lawyer, and the quality of his work was excellent. Mr. Jacobson devoted a total of 22½ full days plus 110¼ hours, accumulated at other times, to his efforts on behalf of Superior relating to the contempt motion. A reasonable fee for his service, excluding costs, is therefore $11,160.

In connection with the contempt proceedings, Mr. Jacobson incurred travel expenses of $2764.37; telephone tolls of $528.26; and copying costs of $92.28. These costs, which I believe it reasonable to include in the award, total $3384.91.

The total fee and costs awarded to Superior for the services of O'Brien and Jacobson, therefore, are $14,544.91.

The Milling firm billed Superior for 282 hours of work on the contempt motion, at an hourly rate of $35.00, for a total fee, less costs, of $8470. These charges were reasonable, in the light of prevailing and customary fees in this area. Total contempt-related costs were $209.23.

The total fee and costs awarded to Superior for the services of the Milling firm, therefore, are $8679.23.

Superior has submitted documentation in support of the following costs incurred in connection with the contempt proceedings:

| | |
|---|---|
| Court Reporters' Fees | $1810.30 |
| Subpoenas and Witness Fees | 297.40 |
| Exhibits | 19.14 |
| Travel Expenses | 1957.32 |
| Meals & Lodging | 243.97 |
| Telephone Tolls | 158.44 |
| Clerical Services | 242.41 |
| Investigative Services | 206.30 |
| TOTAL COSTS | $4935.28 |

Based on the above facts, I determine that a reasonable award to Superior Testers for attorneys' fees and costs incurred in connection with these contempt proceedings is $28,159.42. The Clerk is directed to enter a judgment in favor of Superior Testers, Incorporated, and against Damco Testers, Incorporated, and D. A. Miller, jointly and solidarily, for that amount.